May it please the court, counsel, my name is Will Nesker, I represent the appellant I'd like to reserve three minutes of time for my rebuttal. I would like to use my time to focus this morning on three different issues. First, the exclusion of the expert testimony by the District Court of Dr. Carol Pollack Nelson. Second, the District Court's legal analysis of Kentucky Products Liability Law and its application to the facts. And third, the District Court's order denying our motion to compel discovery of OSI and other similar incidents. As you recall, my client, Darcy Yonts, was injured when he was using one of the appellee's, Easton's, carbon fiber arrows, shooting target practice in his backyard. He released the arrow from his bow and upon releasing the arrow, it shattered and part of the shaft went through the dorsal webbing of his left hand, which was holding the bow. He sustained serious injuries that resulted in around $62,000 of special damages alone. In the course of this action, we retained an expert, Dr. Carol Pollack Nelson, who is message that Easton places on its arrows that direct consumers and users of the arrows to a website or a phone number to then get the warnings that they give regarding their arrows, which is exactly what happened in this case, that the arrow could shatter after significant amounts of use and injure a user or consumer the way that it did. Dr. Nelson came back with her report. She studied the issue and had four criticisms of Easton's arrow. I'd like to focus on her fourth opinion, the fourth criticism. First of all, with respect to the test for expert testimony in this circuit and pretty much every circuit in the country, it's a two part test with two subparts. It's step one and then it's step 2A and step 2B. The first part of the test is the threshold requirement, which is a qualification by knowledge, skill, experience, training, or education. This doesn't seem to be in dispute. The district court acknowledged that Dr. Nelson was qualified. She's a human factors expert. Human factors is an accepted field or discipline, even by the Sixth Circuit. Easton doesn't dispute her credentials at least or her qualifications as a human factors expert. The first part of the test is really not an issue. It's the second two parts of the test, and they're the subparts, 2A and 2B, which are at issue. 2A is relevance and 2B is reliability. This is just what I'm calling them. I don't think the Sixth Circuit uses that language. Relevance is in rule 702A, which requires scientific, technical, or other specialized knowledge which will help the trier of fact to understand the evidence or to determine the fact at issue. And then 2B, reliability, is rule 702B through D. Testimony is based on sufficient facts or data.  And the expert has reliably applied the principles and methods to the facts of the case. So Dr. Nelson's fourth opinion concerns the on-arrow message that Easton has. And you'll see in the briefs that we filed, we give you an image of this on-arrow message. And Dr. Nelson's opinion and criticism of this on-arrow message is this. The content of the on-arrow message fails to adequately alert users to the hazard and draw them to the website. Mr. Yance's failure to pursue the warning referred to on the arrow by going to the website or the toll-free number was reasonable and foreseeable. She spends a significant amount of time in her report, three pages. It's pretty small, isn't it? I'm sorry? What are you going to do, hang a billboard on it? The arrow? I'm sorry. It's kind of tiny around, isn't it? The arrow itself, the shaft? Yeah, it is. He said he saw it. He said he noticed it. He said he saw it and he noticed it. He didn't say he read it. Right. Yeah, that's exactly right. But it did not draw his attention enough. And that's really the point, I think, that Dr. Nelson makes is that, yeah, it's there and you may see it or notice it, but it doesn't stand out enough or it doesn't convey to the user or the consumer the actual danger that lurks. And the only way you get that is if you go to their website or call that toll-free number and then it tells you exactly what can happen. And what Dr. Nelson says is it needs to be stronger. It needs to, you know, it's probably... Based on the nature of the risk? Excuse me? The degree to which it needs to be stronger, is that related to the nature of the risk? Yes, it is. So if it was a small risk, a smaller notice would be okay, and if it was a gigantic risk, life or death, you'd have to have a really big or more drastic or, you know, stop, look, watch out. I think that's very reasonable, yes. But then I'm wondering if testimony as to how, I don't want to say threatening, but how alarming, is that the nature of it is that it just wasn't alarming enough? Right. But isn't how alarming it is depend on how dangerous the arrow is that the expert really didn't know about? That's my concern about this case, to be candid. That comes down to that. Your concern is that the risk didn't warrant what the expert... because it didn't shake him up enough or alarm him enough or scare him enough to go to the website. Or anybody for that. Or a reasonable person to go to the website. But how alarming the notice needed to be, my concern is, is related to how dangerous the arrow is, which is something she didn't have, or the expert didn't have knowledge of. The expert knew, in undertaking her review of the case, knew what happened. That's not the same as how risky it was. I disagree. That relates to the criticism the judge had with respect to, well, maybe I'm thinking of the same one. I thought, oh, number two says the website instructions didn't adequately affect... Right. That's different. In that, the argument was he didn't go to the website anyway, so it didn't make any difference. That's right. What about this? I mean, you know, archery is not an inherently safe sport. I mean, one could argue that any reasonable person who decides to shoot a bow and arrow is aware of various risks. And you would think that any reasonable user might well, upon seeing the warning on the arrow, follow up. What does that... Well, the first part of your question or critique or criticism, I disagree with. Because this is carbon fiber as opposed to aluminum shafts, of which plenty of different arrows are made of. With aluminum shafts, you don't have this problem. You have this problem. It's inherent in carbon fiber. And Easton even admits that. The problem with carbon fiber is, and I've had plenty of carbon fiber cases, products liability cases, is that over time it's like a tire on your car. The tread wears down and you've got to replace it. The same thing happens with carbon fiber. Over time, the carbon fiber, it becomes weakened. You get micro fissures. And it can become weakened to the point where it breaks or shatters. And then it can, in the instance of a carbon fiber arrow, do what happened in this case. In the instance of a carbon fiber bicycle wheel, of which a case I've had before, it just crumbles and it throws you off and you get injured that way. So that's just inherent in the nature of carbon fiber. Now, the second part of your question was, can you remind me, was reasonableness of... Well, I was asking both about what the reasonable person who takes up the activity of archery would think about the activity. Right. And also whether it would be reasonable to see the warning on the arrow itself and not go to the website. And does that have anything to do with the analysis of this case? Yes. Is the final question. Yes. Yeah, that's the whole crux of this case. The crux of this case is that the thought of this on-arrow message was too small, number one. It's probably maybe four or six point as opposed to, you know, I had to write my brief in 14 point font for you all. That's one of the criticisms. That's one of the main criticisms. What would you have done to get a bigger warning on this arrow? A picture, like a lot of things that we're used to, like a picture gram, like a caution sign. That's what the district judge said there was no evidence of that to back up the expert, He said there was no scientific evidence or any kind of scientific data to back that up. And I disagree with that very strongly. There is. And Dr. Nelson, in her report, in her deposition testimony, goes through a litany of peer-reviewed research, CPSC, Consumer Products Commission reports, the American National Standards Institute, ANSI. She goes through a litany of peer-reviewed data, research, literature that suggests that this is the thing that you... Has she reviewed any of the data or has she just read some stuff? She's one of the authors of some of the things that she's relying on. But she's also using other... Whether she generated it or not, that she had access to some reliable data. That is, the data itself that supported her opinion. If you're talking about data specific to arrows and this on-arrow message, no. There was no data out there because Easton didn't keep track of any of this information. We couldn't discover it. I'm not necessarily saying specific to arrows. But on the other hand, one would think that that would be what one would do if one were... If it were out there. But she's a human factors expert. And what she did was she took the research, the scientific background of human factors experts and evaluating warnings and applied that to this on-arrow message. You or I could do that. Well, I don't know that you or I could. I mean, that's the realm of expert testimony. Well, I mean, we could very likely read and summarize the data. Perhaps. It's like the district judge was looking for something else. Could I follow up on my earlier question, if that's all right? I'm not sure I understood the answer. Maybe it got superseded by more questioning. In the fourth element, the fourth... Criticism. Criticism. Thank you. I was raising the concern that it might be necessary for the expert to have knowledge of the danger of the arrow in order to testify, consistent with Daubert, on the question of whether this was sufficient adequately to reflect the danger. And we gave some examples when I was leading up to this question. Like you could have something that's a one in a million chance. Maybe a very tiny warning would be appropriate. The 50% chance you would want something that... It's real alerting, a real... I mean, you agreed with that. I'm not sure it's right, but you agreed with that. That it might make sense that if something is more dangerous, you need a bigger warning. Right? And my question was, is it a legitimate basis to reject this expert testimony on the ground that that aspect of the criticism, she lacked expert testimony to deliver? Or another way of saying this is, is this case distinguishable in a material way from one where there was evidence of just how dangerous these things were and just how likely they were to fall apart and so on, which the district court, in its opinions, raised. I didn't understand the relevance when I first read it, but it seems to be relevant to that. He says there's nothing in there, really, about how dangerous this particular thing is. The testimony is just about how big it is, so it sort of lacks the other half of the equation when you're talking about whether it needs to be large. Do you see what I'm asking? I think so. And the... I think part of the answer is that we attempted to discover other similar incidents, and we did discover there are some other similar incidents. I think we discovered 15 or 16, including this one. But we were stymied when we asked for other similar incidents through different product lines that were similar, that were carbon fiber arrows, maybe manufactured a little bit differently, but then also had the same exact on-arrow message because they had the same underlying defect or problem. And if we could have gotten a hold of that information, then maybe that would have provided the data to... which I think is what you're asking is, if the expert had that data, then they could base their opinion. It would be a more reasonable basis for their opinion. I think that goes to it. I guess I'm just asking if you agree that the degree of danger affects how large the type should be, then in order to opine on how large the type should be, you need to know the degree of danger. Yeah, and I think she does. Right, and she didn't seem to know about the degree of danger. She just knew about how large the typeface should be if you told me what the degree of danger was. I respectfully disagree with that. I think she did know what the danger was. She knew, she reviewed what the actual hazard and danger was with the arrow, and that if someone was using it, it could shatter and go through your hand. She considered that to be a pretty significant danger that required more of an increased... Because that's what happened in this case? Because that's what happens in a lot of cases. There's a lot of other similar incidents. There's a lot of cases where this has happened. Did she rely on that? Did she rely on that? Her critique of four. I'm trying to recall if we gave her the other similar incident information. I'm sure that we did. She didn't seem to know what she was concerned about. Well, I agree with that. They seemed to think it was a one-time freak accident, and that's just not the case. And we provide that information in the brief. There are a lot of OSIs, and some of which we didn't get to discover because the lower court wouldn't let us have discovery on other product lines. There were carbon fiber arrows that carried the same risk and the same hazard, but then they had the same on-arrow message. I know I'm out of time, and I appreciate questions. All right. Mr. Kida? Good morning, Your Honors. May it please the Court, my name is Kevin Kida, and I'm here representing Easton Technical Products. The individual issues raised by the appellant in the briefing, while many, are very simple. And to affirm the trial court, you really need only apply well-established Kentucky law to the record that's presented in the case. And I'd like to jump in by picking up right, Judge Roberts, with an issue that you raised with this issue of proportionality and its importance to this case. And I think you hit the nail right on the head with that, that the nature of the warning and what would be required to be an adequate warning varies based on the proportionality of the risk. And that would mean not only how much injury would be done, but also how likely is it that this is even going to happen. And Ms. Pollack-Nelson, who is excluded below, does not have any basis, testing, opinion, empirical data, hysterical data, to opine on that whatsoever. And she admits such flatly in her deposition. She said she had no historical data to support her opinions. She had no empirical data to support her opinions. She performed no testing, no surveys, in order to form her opinions. The only sort of testing she even refers to is a convenience sample where she called a couple of sporting goods stores, told them that she was trying to buy some arrows for her husband, and asked some general questions. And even she admits that the results from that convenience sample, while not representative, even if done to strict guidelines, likely skewed the results because she basically didn't tell the truth in why she was doing certain things, and people may have been trying to push a sale. And I think the district court relied on that heavily when deciding that that fourth opinion in particular is not based on sufficient reliable facts or data to support an admissible opinion. And this is, of course, where the standard review for this type of an issue is with abusive discretion, and the court has broad discretion not only to determine the ultimate question of if the information is based on reliable facts and data, but also how it's going to go about determining that reliability. If she'd researched and understood the degree of danger and she had, if, and I'm not saying that she did, but if she did, would that then be enough in conjunction with her knowledge of how much writing or how big writing should be for how much danger? Would that have been enough to get her evidence to the jury? Potentially, however, I think there would need to be a couple changes. What would be the theory for that? I'm sorry? I think it actually goes right into Judge Gibbons' comment to the appellant a moment ago, which is the second portion of that is also to show what is the connection that you're drawing. What are you using to draw the connection? If that's not enough, then you're just saying no one can ever recover from one of these types of claims. Not at all, Your Honor. Understanding the proportionality of the risk and then connecting it with sufficient facts and data and or reliable methods is what Daubert and Kumho-Tyre have held as required. In this case, she fails on both counts. So merely if she could say this is going to happen. I'm not so sure that she failed on the account with respect to how big types should be. She has some expert knowledge and she's looking at the literature. I don't know how much literature is out there on this stuff. Maybe there's a lot. Assume that she had enough on that. She still fails, you would argue, because she doesn't know enough about the scope of the risk to be able to apply all that. I agree. Yes, Your Honor. But if she had it and if she had sufficient knowledge of the scope of the risk, that ought to be enough to get to a jury, one would think. I would agree with you. That's just not the record that's presented to the court, nor was it the record before the district court. If I were one to engage in hypotheticals, it would seem to me that what you would do, if you were a plaintiff in this type of case, if you could obtain an expert who knows about arrows in particular and the manufacture of arrows and the safety features and who knows all the things that might bear on what the risk is, what the degree of risk is, and then you combined it with perhaps a human factors person who knew something about human behavior and what it takes to get somebody to sit up and notice. That would certainly have been much more helpful and probably would have, I think, certainly substantially altered the arguments below, if not the result. Are failure to warn cases generally in Kentucky require expert testimony? Generally they do, and that's been cited in two cases in our brief, West v. KKI and Logan v. Cooper Tire and Rubber Company. Is that expert testimony as to the scope of the risk or expert testimony as to what a reasonable person would do if he saw? It seems like you could have a case where there's a hole in the road and the city hadn't put up a big enough sign for someone to see. You don't have to have an expert saying eight-inch letters are more likely to be seen than six-inch letters. The jury could find that, I would think. They don't require an expert for that, do they? Exploring the hypothetical, I would think that in many cases that would be true. I would imagine there could be a case, depending on time of day, visibility on the road, the nature of the hole, the nature of the sign. It might in some circumstances. Certainly. The case law is generally an expert's required, and it's interesting opposing counsel brought up the arrow, a carbon fiber arrow being similar to a tire. That's exactly the circumstances that were met in Kumho Tire and in Goodyear Tire and the Supreme Court of Kentucky below, where you had a tire that had been long used and exploded and caused injury. There were warnings on the tire. There were warnings in the owner's manual. The driver chose not to read the warnings. They drove on it and it exploded, and they basically brought a failure to warn case. Nobody disputed the expert's qualifications to talk about warnings. They disputed the methodology of how they got there. And the fact is they never drew the connection. They started with generalities and understandings about warnings, as we have in this case. She says, larger font is better than smaller font. Certain colors are better than other colors. But they never take any scientific technical steps to go from the generality to, so in this case, this must be the fact. And that's what I was getting at earlier. Not only the proportion of the danger, but you need to have that knowledge and have something to bridge it to the general rules. In this case, Dr. Paulick-Nelson cites in her report to numerous general concepts and abstractions, but when questioned on deposition, and what was presented to the district court, was that she didn't have anything to link the two, and she admitted as much. And that's why I think on both counts that she fell short and the district court's ruling in that regard should be affirmed. And the remainder of her opinions were deemed irrelevant. And I think one factual clarification to address Judge Norris, you mentioned that this part of Appellant's argument was that Mr. Yan stated that he noticed the on-arrow message, but he didn't read it. Or that it was inconspicuous even though he saw it. And this is, I think it's important to point out, the record, that doesn't come from Mr. Yance. He gave his deposition testimony. He never filled out an errata sheet saying anything different. He then answered requests for admissions in which he said that he saw or understood the language on the arrow as saying what it said. In requests for admissions it is, I believe it's record at 79-4, pages 6 and 8, where he admits to noticing and understanding the language that's written right on the arrow. Only afterwards, only now that we get on appeal, has this argument arose that, well technically he didn't really get it though. And even if we accept the fact that that's what that opinion means, all that does is move it back to opinion 4. It means that her first opinion and her fourth opinion are identical. I guess that then strongly gets to the proportionality aspect of it. If he read it and saw it, but it didn't impinge on him that it was that great a risk that he was risking, then he wouldn't read it. I mean that's what normal people will do. They'll read it, you know, there's warnings all over the place. But if they're big, black, and with exclamation points, people are more likely to take them into account. And in this case, there really was no evidence to suggest that this is a major, major risk. And opposing counsel has raised this issue that, well maybe this has to do with this OSI and the motion to compel argument, his third argument that he wanted to discuss with you today. And there's one, I think, important clarification on that point as well. Opposing counsel has referred to these as other similar instances. But there's really nothing in the record to suggest that either. The motion to compel issue and what was brought before the court was that for every reported incident on every one of 50 different carbon fiber arrow lines, 48 of which have completely different manufacturing and design processes put into them. So going back to your proportionality issue, with a completely different design and manufacturing process put into these other carbon fiber arrows, it stands to reason that the proportionality of the risk on one arrow may be different than that of another. And even hypothetically arguing, this exact pointing we're talking about may be good for one and may be not good for another based on the nature of the makeup of that particular arrow. The judge's decision to narrow the scope of discovery to the specific arrow in this case and I think it was called the epic arrow, which is the substantially similar arrow, and give discovery related to two arrow lines with very similar processes, it was well within their discretion. It allowed plaintiff to explore other instances to then build on that investigation through discovery and hopefully build an argument in their case that would have related to proportionality and would have substantiated the opinions that Dr. Pollack Nelson wanted to offer below. Presumably the online warning was particular to this arrow. Correct. It would be, yes, it would be particular to carbon fiber arrows in general because the testing performed would be the same. The results of the testing on various arrows, depending on their makeup, may be slightly different. But yes, the testing applies to all of them. And that was the third opinion that she offered. So is this the same warning given on all the different arrows in the line, regardless of the manufacturing process? Correct. Okay. Correct. But it's not particular to this arrow. Correct. It particularly applies to carbon fiber arrows and the testing that is required for these arrows is before every shot to feel up and down the arrow while you turn it, looking for cracks, any sort of dents, any sort of damage, bending the arrow, rotating the arrow, and twisting it to try and listen for anything. And they're designed in such a way that if you hear any sort of a crack or any sort of a sound, that it's way overpassed you. It's going to be overly sensitive, I should say. Even if the next shot wouldn't break it, it's going to catch it early. Where in the record is it that he agreed that he cognized the language in the warning? I believe it's request for admission, 79-4, page 6 or 8, I believe. Thank you. And it was on page 6 he also admits that he chose not to visit the website even after seeing that warning. With the exclusion of Dr. Pollack-Nelson, that is dispositive of really the remaining issues in the case. It's not even been argued by opposing counsel that expert testimony would not be required in a case like this. And the court found that much similar to the tire argument that we spoke of earlier, that the warnings required for something like a carbon fiber arrow with resin manufacturing, the proportionality issue is not something within the common knowledge of the average juror. There are documents in the record that are sealed? Correct. What's the reason for that? There was a protective order entered into regarding the discovery of alleged similar incidences, and I believe with the testimony of Easton's representative, Karen Griffin. Is this one of these cases where the briefs are not sealed? Our brief is unsealed. There is some information in Appellant's brief that was sealed. What's the procedure for our opinion? Do we have any concerns about saying things in the opinion that are sealed if we rely on parts of the brief? Your Honor, I'm not sure as far as publishing opinions, as far as matters that would be sealed or unsealed. Truthfully, I'm confident that the issues that are covered in the sealed portions, that the court need not even reach those. They generally have to do with the argument for punitive damages. In this case, the— I'm not sure how to get to it. Okay. It doesn't seem like that's something that would be sealed. Well, it may be contained in something else. It may have been. I believe 79-4 means it was an attachment to a motion most likely, and the motion may have been filed under seal due to reference to other sealed material. I realize I'm nearly out of time, so if there are no further questions, we rest on the arguments in the brief and ask that the court affirm the district court below. Thank you, Your Honor. Thank you, Your Honor. I'll go back to the question of Judge Rogers with respect to expert testimony being generally required in these types of cases. There is some Kentucky precedent. There is precedent in Kentucky. That is the general rule, but there are exceptions to that rule. What is the general rule? It is a general rule. What is the general rule? The general rule is that expert testimony is required. For what? Well, the side I'm going to give you is Jarboe v. Harding, which is 397 Southwest 2nd, 775. And the holding of that case is that Kentucky courts recognize an exception to the general rule that requires expert testimony for situations in which causation is so apparent that laymen with general knowledge would have no difficulty recognizing it. I think it's a medical malpractice case. In medical malpractice, you need an expert. And you need an expert both with respect to the departure from the standard of care and with respect to causation. Generally, yes. That doesn't mean you need an expert in every tort case in Kentucky. No. Well, things like leaving the sponge in after the surgery and stuff like that, that may not require an expert. Like a slip or fall case, you don't need expert testimony. There are all kinds of torts that don't presume. Right. Motor vehicle rear-enders. Not much since I taught it, I don't think. Motor vehicle rear-end accidents, premises cases, liability, you don't need liability experts for those types of matters. No. What is it about this that generally requires? Because the way the product is put together is something that you would need an expert for. Well, you know, I'm asking about adequate notice. Adequate notice is something you need an expert for in Kentucky. If there is jurisprudence on that, I'm not aware of it. Going back to this issue with the OSIs, again, it's intertwined with your questions about whether or not the expert knew the scope of the hazard or what the risk was, the size of the risk, if you will. When we were limited on discovery and getting this information about the other lines, and there are almost 48 to 50 other different lines, then we were very limited in finding out just how widespread this hazard may be. I would submit to your honors that if you were inclined to decide in our favor, that we need to get that discovery in order to figure out the answers to your questions. I'm out of time, and thank you for your time. We appreciate very much the arguments you've both given, and we will consider the case carefully. And with that, you may adjourn court.